# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**TARA HUNTER (#575198)**                                    **CIVIL ACTION NO.**

**VERSUS**                                                          **19-327-BAJ-EWD**

**FREDERIC BOUTTE, ET AL.**

## <u>NOTICE</u>

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U. S. District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein. Failure to file written objections to the proposed findings, conclusions and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on August 29, 2022.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**TARA HUNTER (#575198)**                          CIVIL ACTION NO.

**VERSUS**                                         19-327-BAJ-EWD

**FREDERIC BOUTTE, ET AL.**

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the Court is a Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("Petition"), filed by Tara Hunter ("Hunter"), who is representing herself and who is confined at the Louisiana Correctional Institute for Women in St. Gabriel, Louisiana.[1] Hunter presents four grounds for relief: (1) ineffective assistance of counsel, (2) failure to grant a severance from co-defendant at trial, (3) tainted and prejudicial photographic lineup, and (4) jury selection violated *Batson v. Kentucky*.[2]  The District Attorney for the Twenty-First Judicial District Court, Parish of Livingston, State of Louisiana ("Respondent") filed a Response.[3]  As Hunter has not shown that the state courts' adjudication of any of her claims  either "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[4]  It is recommended that Hunter's Petition be denied.  There is no need for oral argument or an evidentiary hearing.

---

[1] R. Doc. 1.
[2] 476 U.S. 79 (1986).  R. Docs. 1 & 1-1.  Though Hunter lists as an "issue" that she was compelled to be a witness against herself in violation of the Fifth Amendment (R. Doc. 1-1, p. 7), Hunter has not provided any argument regarding this issue.  Relying on just a conclusory statement, renders the claim subject to dismissal.  *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) ("mere conclusory allegations do not raise a constitutional issue in a habeas proceeding.").  Further, Hunter did not testify at trial, nor are any other circumstances present to demonstrate the possibility that Hunter's Fifth Amendment right against self-incrimination was violated.
[3] R. Doc. 11. Hunter also filed an Objection to the State's Response.  R. Doc. 13.
[4] 28 U.S.C. §2254(d).

## I.    PROCEDURAL HISTORY AND FACTUAL BACKGROUND

Hunter was indicted by a grand jury on June 1, 2006 for two counts of armed robbery in violation of La. R.S. 14:64.[5] She pled not guilty on June 21, 2006.[6] After a jury trial, on July 23, 2010, Hunter was found guilty of armed robbery of Patricia Baker.[7] She was sentenced to 20 years at hard labor with credit for time served on August 26, 2010.[8]

The factual background, as correctly stated by the Louisiana Court of Appeal for the First Circuit ("First Circuit") is as follows:[9]

> On March 29, 2006, near 2:00 p.m., Patricia Baker (the victim) returned to her residence in Albany, Louisiana, following a shopping trip to Baton Rouge. The victim went into the backyard to check on her dog and was returning to her car in the driveway when she noticed a gray, four-door vehicle had parked there. She walked up to the vehicle, which had two people in it, and asked if she could help. The driver was a slim black male with gold teeth wearing a white shirt. The victim initially thought that the passenger was another man. During the trial the victim described the passenger as a woman wearing a white, long-sleeved men's shirt with a button-up collar, with her hair slicked back, The couple asked the victim for directions to New Orleans, and they engaged in conversation for about ten to fifteen minutes, during which time the victim was standing about three to four feet from the vehicle. The victim told them she had to go take care of her other dog but, as she turned around and bent down to get the dog's chain, the driver exited the vehicle, came up behind her, and ordered her to give him her keys. A struggle ensued for the keys and her purse, which was on her shoulder. The man became increasingly violent, and as he tried to put a gun into the victim's mouth, he cut her lip and chipped her tooth. When he cocked the gun, the other person in the car, who the victim noticed had moved to the driver's seat, screamed at him and said to just take the purse and "let's get out of here." The man tugged on the purse, dragging the victim as she held on to the purse strap. Eventually, the strap on the purse broke, the man took it, and then he and the other individual drove off in the gray car.

> The victim called 911 and the police arrived, at which time she gave a statement describing the perpetrators as two black males, one heavyset and the other tall and slim with gold teeth. The next day, on March 30, the victim identified the codefendant in a photographic lineup. The following day, March 31, she also identified the defendant from a photograph lineup. At the trial, she noted that the

---

[5] R. Doc. 10, pp. 59-61.
[6] R. Doc. 10, p. 14.
[7] R. Doc. 10-1, p. 99; R. Doc. 10-7, p. 147.  Hunter was tried with co-defendant Kendrick Mattire ("Mattire").
[8] R. Doc. 10-7, p. 14.
[9] *State v. Hunter*, 2014-0221 (La.App. 1 Cir. 9/19/2014), 2014 WL 467598, at *1.

defendant's clothing and hair style caused her to initially think that the defendant was a male.

Shortly after Baker was robbed, Alton Elms, who was working at Range Car Wash in Denham Springs, noticed a purse lying on top of a full garbage can. There were police in the area, so he gave the purse to an officer and showed him where he had found it. At trial, the purse, which had only one strap, was identified as the one taken from Baker.

## II.    LAW & ANALYSIS

### A.  The Petition is Timely

Pursuant to 28 U.S.C. § 2244(d), there is a one-year statute of limitations applicable to federal habeas corpus claims brought by prisoners in state custody.  This limitations period begins to run on the date the judgment becomes final through the conclusion of direct review or through the expiration of time for seeking such review.[10]  If a petitioner stops the direct appeal process before proceeding through all available state courts, "the conviction becomes final when the time for seeking further direct review in the state court expires."[11]

The time during which a "properly filed" application for state post-conviction or other collateral review is "pending" in the state courts is not counted toward the one-year limitations period.[12]  Conversely, any time during which there are no properly filed, post-conviction or collateral review proceedings pending before the state courts does count toward the one-year period.  A state post-conviction relief ("PCR") application is considered "pending" (1) while it is before a state court for review; and (2) during the time authorized to file a timely application for further review at the next level of state consideration (thirty days in the State of Louisiana, unless an *allowable* extension is granted).[13]

---

[10] 28 U.S.C. § 2244(d)(1)(A).
[11] *See Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir. 2003).
[12] 28 U.S.C. § 2244(d)(2).
[13] *Melancon v. Kaylo*, 259 F.3d 401, 406 (5th Cir. 2001).

The State argues that the Petition is untimely.  The State's reliance on *Sibley*,[14] an Eleventh Circuit case, to reach this conclusion is misplaced.[15]  In *Sibley*, the question before the Eleventh Circuit was whether a filing by the petitioner constituted a properly filed application for State post-conviction or other collateral review that tolled the statute of limitations for filing a federal habeas petition.[16]  That court held that documents filed by the petitioner after the deadline for filing a federal habeas petition had elapsed could not toll the deadline because "once a deadline has expired, there is nothing left to toll."[17]  This case presents a wholly different situation in which the First Circuit originally held that Hunter's appeal was untimely, but then later recognized its mistake and concluded that the appeal was timely.[18]  The First Circuit remanded to the trial court to "enter an order of appeal, to set a return date, and if relator is indigent, to appoint the Louisiana Appellate Project to represent relator on appeal."[19] For purposes of § 2241(d)(1)(A), in this case, Hunter's conviction was not final until the direct appeal process concluded and the time period for seeking further relief with the Supreme Court of the United States expired.[20]

---

[14] *Sibley v. Culliver*, 377 F.3d 1196, 1203 (11th Cir. 2004).

[15] R. Doc. 11, p. 6.  The State argues that notwithstanding *Sibley*, the Petition is still untimely, but the State has used wholly inaccurate dates in making this calculation.  For example, the State argues that the Petition was not filed until November 1, 2019, when it was filed on May 21, 2019.  *See* R. Doc. 1, p 11.

[16] *Sibley*, 377 F.3d at 1200.

[17] *Id.* at 1204.

[18] R. Doc. 10-7, p. 116. Hunter's direct appeal was originally dismissed as untimely on April 23, 2012; the order of the First Circuit noted that Hunter could seek an out-of-time appeal by application for post-conviction relief filed with the district court. R. Doc. 10-7, p. 19. Hunter filed an application for post-conviction relief ("PCR") seeking an out of time appeal on August 27, 2012. R. Doc. 10-7, pp. 77-82. The trial court denied the out of time appeal (R. Doc. 10-7, p. 95; R. Doc. 10-18, p. 116), but on November 21, 2013, the First Circuit granted supervisory writs and found that Hunter's appeal was timely all along. R. Doc. 10-7, p. 116 ("Since the dismissal of relator's appeal, this Court has discovered that defense counsel made a premature motion for appeal, which was cured by the imposition of sentence …. Because relator's attorney gave notice at the beginning of the sentencing proceedings of relator's intent to appeal, the request for appeal was timely.")

[19] *Id.*

[20] In *Jimenez v. Quarterman*, 555 U.S. 113, 121 (2009), the Supreme Court held that if a state court grants an out of time direct appeal, that resets the date when the conviction becomes "final" for purposes of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), and the conviction becomes final at the "conclusion of the out-of-time direct appeal, or the expiration of the time for seeking review of that appeal." *Id.* If leave to file an out-of-time appeal that was otherwise untimely is sufficient to reset the date the conviction becomes final for purpose of AEDPA, then certainly Hunter's appeal that was mistakenly deemed untimely but was timely all along warrants at least the same treatment.

After the First Circuit concluded Hunter's original appeal was timely, a timely appellate brief was submitted on her behalf on March 26, 2014.[21]  The First Circuit denied the appeal on the merits. Hunter sought review with the Louisiana Supreme Court, which denied relief on September 25, 2015.[22]  Hunter's conviction became final ninety days later, on December 25, 2015.[23]  On December 27, 2015, the one-year clock started for Hunter's federal habeas petition.[24]  On July 26, 2016, Hunter filed a PCR application with the state trial court.[25]  The PCR application stopped the clock on the one-year time period. After denial of her PCR application by the trial court,[26]  Hunter sought review with the First Circuit,[27]  which summarily denied the writ on Hunter's PCR application on March 5, 2018.[28]  Hunter sought review with the Louisiana Supreme Court,[29]  which denied relief on April 22, 2019.  This Petition followed and was filed on May 21, 2019.[30]

212 days passed between the finality of Hunter's conviction on December 26, 2015, and the filing of her PCR application on July 26, 2016.  The PCR application remained properly pending until it was ultimately denied by the Louisiana Supreme Court on April 22, 2019.  Another 28 days passed until Hunter filed her Petition with this Court dated May 21, 2019.[31]  Accordingly, only 240 days passed that counted against Hunter's time to file a federal habeas petition, much less than the allowed 365 days.  Thus, the Petition is timely.

---

[21] R. Doc. 10-7, p. 132.

[22] R. Doc. 10-16, p. 251.

[23] As December 25 is a legal holiday, which is not included for purposes of calculating time periods (La. R.S. 1:55), Hunter's last day to seek review with the Supreme Court on direct appeal was December 26, 2015.

[24] *Brown v. Vannoy*, No. 17-314, 2021 WL 4074793, at *2 (M.D. La. Aug. 6, 2021), report and recommendation adopted, No. 17-0314, 2021 WL 4066989 (M.D. La. Sept. 7, 2021) (including the last day a petitioner has to file with a court on direct review or the day the application for postconviction relief is filed is incorrect).

[25] R. Doc. 10-17, pp. 128-159.

[26] R. Doc. 10-20, pp. 172-201.

[27] R. Doc. 10-20, pp. 203-224.

[28] *State v. Hunter*, No. 17-1767 (La.App. 1 Cir. 3/5/2018), 2018 WL 1168381.

[29] R. Doc. 10-20, pp. 137-158.

[30] R. Doc. 1.

[31] R. Doc. 1, p. 11.  The "prison mailbox rule" was adopted by the Supreme Court in *Houston v. Lack*, 487 U.S. 266, 270-71 (1988).  Accordingly, this Report uses the date the Petition was signed and dated as the date of filing, rather than the date the filing was received by the Court.

### B.  The Claims Raised in the Petition Are Without Merit[32]

#### 1.  AEDPA Standard of Review[33]

Under 28 U.S.C. § 2254(d), an application for a writ of habeas corpus shall not be granted with respect to any claim that a state court has adjudicated on the merits unless the adjudication has "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[34]  Relief is authorized if a state court arrived at a conclusion contrary to that reached by the Supreme Court on a question of law or if the state court decided a case differently than the Supreme Court on materially indistinguishable facts.[35]

Relief is also available if the state court has identified the correct legal principle but has unreasonably applied that principle to the facts of the petitioner's case or has reached a decision based on an unreasonable factual determination.[36]  Mere error by the state court or mere disagreement on the part of this Court with the state court determination is not enough; the standard is one of objective reasonableness.[37]  State court determinations of underlying factual issues are

---

[32] The State concedes that it "believes the claims set forth in [the Petition] have been properly exhausted" (R. Doc. 11, p. 7).  While not an express waiver of the exhaustion requirement, it is "at least the equivalent of failure to assert the defense of non-exhaustion." *See Carty v. Thaler*, 583 F.3d 244, 256 (5th Cir. 2009), citing *McGee v. Estelle*, 722 F.2d 1206, 1213 (5th Cir. 1984).  Accordingly, exhaustion is not specifically analyzed. The discussion of any claim that was not fully exhausted should be considered an exercise of the express authority granted to this Court by § 2254(b)(2) to deny unexhausted claims on the merits. *See* 28 U.S.C. § 2254 (b)(2) ("An application for writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

[33] AEDPA overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.

[34] Each claim discussed in this Report was decided by *a* state court on the merits. Because there is a decision on the merits by a state court, AEDPA deference generally applies.  The deferential standards of review apply to claims adjudicated on the merits by the state courts—the statute does not distinguish between claims fully exhausted and claims simply "adjudicated on the merits in State court." 28 U.S.C. § 2254(d).  *See Bedoya v. Tanner*, No. 12-1816, 2019 WL 1245655 at *10-11 (E.D. La. Feb. 20, 2019) (discussing AEDPA's standards of review even though some claims were only exhausted at the state trial court level).

[35] *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

[36] *See Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000).

[37] *Id.  See also Williams*, 529 U.S. at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable").

presumed to be correct, and the petitioner has the burden to rebut that presumption with clear and convincing evidence.[38]

### 2. Claim One: Ineffective Assistance of Counsel[39]

Hunter argues that her trial counsel was ineffective because he failed to impeach a key witness for the prosecution and instead, allowed impeachable testimony.[40] The trial court provided the last "reasoned" opinion regarding this claim, after questioning of Hunter, stating "[b]ased on the testimony of Ms. Tara and the review of the file, I find that the motion is not warranted, therefore would be denied. The ineffective counsel would be denied."[41] A habeas petitioner who asserts that he was provided with ineffective assistance of counsel must meet the *Strickland* standard by affirmatively showing: (1) that her counsel's performance was "deficient", *i.e.*, that

---

[38] 28 U.S.C. § 2254(e)(1).

[39] R. Doc. 1-1, pp. 12-17. This claim was exhausted through Petitioner's PCR application. *See* R. Doc. 10-17, pp. 140-145. Though supporting her argument with the contention that "false testimony" of Patricia Baker given during trial amounts to prosecutorial misconduct, the Petition is not interpreted as bringing a claim of prosecutorial misconduct. R. Doc. 1-1, p. 15. Rather, this comment seems to be provided to demonstrate the severity of trial counsel's ineffectiveness. To the extent the exact ineffective assistance of counsel claim regarding Baker's testimony was not exhausted through the appellate process, it is recommended that this Court exercise the authority expressly granted by 28 U.S.C. § 2254(b)(2) to deny the unexhausted claim on the merits. To the extent Hunter is attempting to assert that Baker's testimony violated her Fifth Amendment due process rights, such a claim is not cognizable and not discussed further because Hunter has not provided any facts to demonstrate Baker's statements were false, only that they were inconsistent with prior statements. R. Doc. 1-1, pp. 13-14 ("Petitioner contends that the state allowed impeachable testimony of the witness statement which deprived her of her Due Process rights a violation of her Fifth Amendment when her trial counsel failed to impeach the inconsistent statements of the prosecutor's key witness Patricia Baker….").

[40] R. Doc. 1-1, pp. 13-16. Within Hunter's arguments regarding ineffective assistance of counsel is a subheading indicating the trial court erred in denying her Motion for Post-Verdict Judgment of Acquittal; the substance of this argument is regarding the testimony of Baker, but the argument sounds in one of insufficiency of the evidence. R. Doc. 1-1, p. 17. To the extent Hunter meant for this to be a claim of insufficiency of the evidence, it fails. Hunter's sole argument regarding insufficiency of the evidence is that Baker's testimony was unreliable. R. Doc. 1-1, p. 17. In Hunter's PCR proceedings, the trial court provided the last reasoned decision regarding this claim, and it was denied. R. Doc. 10-20, p. 186-87. *Jackson v. Virginia*, 443 U.S. 307 (1979) provides the standard for testing the sufficiency of the evidence, and the relevant question "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. The evidence presented, including eyewitness identification, which was fully explored at trial, viewed in the light most favorable to the prosecution, was sufficient for any rational trier of fact to find Hunter guilty beyond a reasonable doubt of armed robbery; thus, Hunter cannot show that the state court's decision rejecting her claim was contrary to clearly established federal law as determined by the Supreme Court of the United States, nor was it based on an unreasonable determination of the facts considering the evidence presented. Accordingly, to the extent Hunter sought to bring this claim, it is without merit.

[41] R. Doc. 10-20, pp. 177-85.

counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and (2) that the deficient performance prejudiced her defense, *i.e.*, that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial in which the result is reliable.[42]  The petitioner must make both showings in order to obtain habeas relief based upon the alleged ineffective assistance of counsel.[43]

To satisfy the deficiency prong of the *Strickland* standard, the petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional standards.[44]  The reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence and that, under the circumstances, the challenged action might be considered sound trial strategy.[45]  This Court, therefore, must make every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial.[46]  Great deference is given to counsel's exercise of professional judgment.[47]

If the petitioner satisfies the first prong of the *Strickland* test, his petition nonetheless must affirmatively demonstrate prejudice resulting from the alleged errors.[48]  To satisfy the prejudice prong of the *Strickland* test, it is not sufficient for the petitioner to show that the alleged errors had some conceivable effect on the outcome of the proceeding.[49] Rather, the petitioner must show a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.[50]  The habeas petitioner need not show that his counsel's alleged errors "more

---

[42] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).
[43] *Id.*
[44] *See, e.g., Martin v. McCotter*, 796 F.2d 813, 816 (5th Cir. 1986).
[45] *See, e.g., Bridge v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988).
[46] *Martin*, 796 F.2d at 817.
[47] *Bridge*, 838 F.2d at 773; *Martin*, 796 F.2d at 816.
[48] *Earvin v. Lynaugh*, 860 F.2d 623, 627 (5th Cir. 1988).
[49] *Strickland*, 466 U.S. at 693.
[50] *Martin*, 796 F.2d at 816.

likely than not" altered the outcome of the case; he must instead show a probability that the errors are "sufficient to undermine confidence in the outcome."[51] A habeas petitioner must "affirmatively prove," not just allege prejudice.[52] Both the *Strickland* standard for ineffective assistance of counsel and the standard for federal habeas review of state court decisions under 28 U.S.C. § 2254(d)(1) are highly deferential, and when the two apply together, the review by federal courts is "doubly deferential."[53]

Regarding trial counsel's performance as it relates to the testimony of Patricia Baker ("Baker"), contrary to what is argued by Hunter, her trial counsel, Carl Perkins ("Perkins"), did question Baker on her inconsistent statements.[54] Perkins drew the jury's attention to Baker's inconsistent statements from the start of trial, noting during his opening statement that Baker allegedly spoke to the two Defendants for eight minutes, yet Baker thought both were males until sometime later, when she changed her story.[55] Perkins also noted that Baker had given inconsistent stories regarding one perpetrator getting in and out of the car.[56] Further, throughout Baker's testimony, Hunter's counsel called into question the reliability of Baker's statements and pointed out her original identification as the perpetrators being both male.

> Q: Okay, do you recall telling them that there were two black males?
> A. Yes.
> Q: Do you recall telling them that both of the black males were out of the car, talking to you?
> A: No, I did not.[57]

---

[51] *Id*. at 816-17.
[52] *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009).
[53] *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).
[54] The prosecution anticipated Perkins was going to focus on Baker initially identifying the second perpetrator as a male and brought up the issue on direct examination. R. Doc. 10-13, p. 180. Mattire's counsel also pointed out that Baker originally identified her assailants as two males. R. Doc. 10-13, pp. 197, 205.
[55] R. Doc. 10-12, p. 137. Testimony also indicated that the person eventually identified as Hunter had her hair slicked back close to the scalp, which is why Baker thought the individual was a man. R. Doc. 10-13, p. 180 and R. Doc. 10-14, p. 161-162.
[56] R. Doc. 10-12, p. 137.
[57] R. Doc. 10-13, p. 217.

****

> Q: Okay. But maybe so, but you stated that they were both males and they
>     got out of the car? She wasn't a she, on that day, correct?
> A: I might have.[58]

Hunter's counsel questioned Baker regarding the line-ups she was shown after the incident:

> Q: When they showed up at the Tourism Center, did they show
>     photographs of both males and females?
> A: No, not that day.
> Q: The first day, they just had photographs of males?
> A: Um hum.
> Q: Okay. Did you change – on that day, you identified a male, right, correct
>     on the first day, you identified the male?
> A: Yes.
> Q: Okay, so then they come back on the second day?
> A: Yes.
> Q: And they bring photographs of females, okay? Is that correct?
> A: I assume they all were females.
> Q: Okay. At what point do you change your story to tell the police officers
>     that the other male was a female? When did that happen?
> A: I don't recall.[59]

Hunter's counsel also pointed out other inconsistencies between Baker's initial statement and her

testimony, including that she originally stated both perpetrators exited the car, but her testimony

on the day of trial was that one perpetrator stayed in the car.[60]  Other witnesses also testified that

Baker originally reported being robbed by two males,[61] and Hunter's counsel confirmed this

through his questioning.[62]  Counsel also questioned the veracity of Baker's testimony regarding

the incident by pointing out other inconsistencies between her statements on the day of the incident

and in court.[63]  Finally, Perkins closed with again arguing that Baker's testimony was inconsistent:

"Patricia Baker has testimony that's been inconsistent, to say the least. Inconsistent, being first,

---

[58] R. Doc. 10-13, p. 219.
[59] R. Doc. 10-13, pp. 219-220.
[60] R. Doc. 10-13, pp. 217-218.
[61] R. Doc. 10-13, p. 231 (Deputy Schiligemeyer, who responded to Baker's report of a robbery).
[62] R. Doc. 10-13, p. 239.
[63] R. Doc. 10-13, p. 239-240.

swore up and down it was two males, then, after she's shown the photographs, the police show up with a lineup to show her a woman, when they had no information whatsoever that a woman had participated in the crime, certainly, would make you think, that that may have been somewhat misleading to Ms. Baker."[64] Perkins did more than enough to highlight Baker's inconsistent statements; thus, Hunter's assertion that he was ineffective for failing to do so is without merit. Further, the degree to which he chose to question the victim is a matter squarely within the realm of strategy and the decision not push the point further than he did on cross-examination of Baker is not enough to establish ineffectiveness.[65]

To the extent Petitioner claims trial counsel was generally ineffective, such a claim fairs no better.[66] Perkins was an active participant throughout the trial; he questioned witnesses[67] and made apt objections.[68] As Hunter has not established that her trial counsel's performance was , deficient, this claim must fail.[69]

---

[64] R. Doc. 10-15, p. 33.

[65] *Pierce v. State*, No. 13-49, 2016 WL 721519, at *5 (N.D. Miss. Jan. 7, 2016) (the treasurer of a church that was burglarized testified that the burglary occurred on a Wednesday night when it actually occurred on a Sunday night; counsel's choice to not push the point of an insignificant mistake on cross-examination was an example of effective, not ineffective assistance).

[66] R. Doc. 1-1, p. 13.

[67] Perkins effectively pointed out potential ways by which certain photographic lineup identifications could have been contaminated and called into question those lineups.  R. Doc. 10-14, pp. 156-164.

[68] *See, e.g.*, R. Doc. 10-13, pp. 174, 179; R. Doc. 10-14, pp. 34-35, 43-44, 67, 74-75, 85-88, 124-125; R. Doc. 10-15, pp. 39-40.  Hunter was also charged with armed robbery of Shanna Hamilton (R. Doc. 10, pp. 59-60) but was acquitted on that count.  R. Doc. 10-1, p. 99.  Perkins aptly cross-examined Hamilton regarding that charge.  *See* R. Doc. 10-13, pp. 36-41.

[69] To the extent Hunter attempts to allege her post-conviction relief counsel was ineffective, she cannot state a claim. *Martinez v. Johnson*, 255 F.3d 229, 241 (5th Cir. 2001) (ineffectiveness of post-conviction counsel cannot be the grounds for federal habeas relief).  Finally, to the extent Hunter states in her facts that Perkins was ineffective appeal counsel due to issues surrounding the timeliness of her appeal, she has not demonstrated she was prejudiced by Perkins' performance because she was ultimately appointed other counsel who represented her on her timely direct appeal.  *Hamilton v. McCotter*, 772 F.2d 171, 182 (5th Cir. 1985) ("It is also the accused's burden to establish that the particular lapse was prejudicial, that there is 'a reasonable probability' that but for the error the ultimate result would have been different.").  Thus, to the extent Hunter attempted to bring any claim regarding Perkins' performance relative to the appeal, such claim is without merit.

### 3.   Claim Two: Failure to Grant a Severance[70]

Petitioner argues that failure to sever her trial from that of her co-defendant, Mattire, comprised her right to a fair trial.   "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."[71] A federal court may not grant habeas relief based on an alleged error in the interpretation or application of state law.[72]

"There is no clearly established federal law set forth by the Supreme Court holding that co-defendants have a right under the Due Process Clause not to be joined for trial, even for defendants with antagonistic defenses."[73]   The Supreme Court has held that severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."[74]   The Supreme Court has also expressly noted that "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials."[75]   Federal courts routinely deny habeas claims based on a failure of a state trial court to sever co-defendants for trial.[76]

---

[70] R. Doc. 1-1, p. 17. This claim was addressed on direct appeal.

[71] 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

[72] *Estelle*, 502 U.S. at 68; *see also Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994) (a federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law") (citation and quotation omitted); *Swarthout v. Cooke*, 562 U.S. 216, 218 (2011) (federal habeas review does not lie for errors of state law).

[73] *Duckett v. Vannoy*, No. 16-6823, 2017 WL 6001729, at *11 (E.D. La. June 7, 2017), report and recommendation adopted, No. 16-6823, 2017 WL 5992077 (E.D. La. Dec. 4, 2017).

[74] *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

[75] *Id.* at 539-540.

[76] *See, e.g.*, *Duckett*, 2017 WL 6001729, at *11; *Rumley v. Vannoy*, No. 19-9649, 2020 WL 9422952, at *16 (E.D. La. May 29, 2020), report and recommendation adopted, No. 19-9649, 2021 WL 1721011 (E.D. La. April 30, 2021); *Thomas v. Cain*, No. 13-38, 2014 WL 1689304, at *7 (M.D. La. April 29, 2014) (holding that the petitioner had not shown there was a serious risk that the joint trial compromised a specific trial right or prevented the jury from making a reliable determination about guilt or innocence).

Hunter's trial counsel moved for a severance arguing that Hunter may present defenses in conflict with Mattire, so a joint trial would be unfairly prejudicial to Hunter.[77] The trial court denied the motion to sever.[78] The last reasoned opinion regarding the failure to sever is from the First Circuit, which rejected the claim on direct appellate review, reasoning as follows:[79]

> Defendants who are jointly indicted are to be tried together unless the court finds that justice requires a severance. The courts have permitted a severance to codefendants whose defenses are antagonistic to each other. Defenses are antagonistic when each defendant intends to exculpate himself by putting the blame for the offense on a codefendant. However, a mere allegation that the defenses are antagonistic is insufficient because convincing evidence of actual antagonism must be present to justify a severance. An accused is not entitled to a severance as a matter of right; the decision is one resting within the sound discretion of the trial judge. A denial of a motion to sever will not be overturned on appeal absent a clear abuse of discretion. Reversal of a conviction for failure to sever where antagonism is shown is not always mandated unless prejudice can be shown.

> After reviewing the record, we are unable to find convincing evidence of antagonistic defenses. The defendant's defense was not antagonistic to codefendant Mattire's defense. The defendants relied on a defense of mistaken identity and/or extent of participation; not that one was mistaken for the other. Further, the jury was apparently able to separate the issues as the defendant was found not guilty on count one though the codefendant was found guilty as charged on all counts. Therefore, the defendant has failed to make a showing of prejudice. Assignment of error number one is without merit.[80]

Based upon a review of the entire record, there is no evidence of antagonistic defenses presented by Hunter and her co-defendant, Mattire. Rather, as noted by the First Circuit, Mattire and Hunter had the same defense: mistaken identity, not that one was mistaken for the other, but that both were mistaken. Also, as noted by the First Circuit, the fact that Hunter was found not guilty on one count while her co-defendant was found guilty on all counts indicates that the jury

---

[77] R. Doc. 10, p. 144.
[78] R. Doc. 10, p. 26.
[79] *State v. Hunter*, 2014-0221 (La.App. 1 Cir. 9/19/14), 2014 WL 4667598, at *2, writ denied, 2014-2203 (La. 9/25/15), 178 So. 3d 157.
[80] *Id.* (internal citations omitted).

was able to properly separate the defendants and offenses, demonstrating a lack of prejudice.[81] Accordingly, the state court's rejection of Hunter's claim based on failure to sever does not contravene clearly established federal precedent, and this assignment of error is without merit.

### 4. Claim 3: Tainted and Prejudicial Photographic Lineup[82]

Next, Petitioner argues that the photographic lineup used to identify her was tainted and prejudicial, apparently because it was suggestive. The defense filed a Motion to Suppress the photographic lineup, and, after a hearing, the Motion was denied.[83]  In the last reasoned state court opinion discussing the issue, the First Circuit stated as follows:

> Based on our review of the photographic lineup used in this case and the testimony presented at the hearing and the trial, we are not convinced that the photographic lineup unduly focused the witness's attention on the defendant. We find that there is no indication that the identification procedure was suggestive in this case and there was no substantial likelihood of misidentification. The witness had an ample opportunity to observe the perpetrators and she positively identified the defendant only two days after the incident. The second assignment of error is without merit.[84]

"Whether identification testimony is constitutionally admissible is a mixed question of fact and law and is not entitled to a presumption of correctness under 28 U.S.C. § 2254(d),"[85] but "the factual findings underlying the determination of the admissibility of identification testimony are entitled to that presumption."[86] Two questions must be answered affirmatively for the identification procedures to be deemed unconstitutional: 1) was the identification procedure

---

[81] *See* R. Doc. 10-15, p. 71.  No other grounds for finding prejudice exist. *See Zafiro*, 506 U.S. at 539 (prejudice may exist when inadmissible inculpatory evidence against the defendant is rendered admissible because it is admissible against the codefendant; additionally, "a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial.").

[82] R. Doc. 1-1, pp. 17-19. This claim was adjudicated on direct appeal.

[83] R. Doc. 10-1, p. 149 to R. Doc. 10-2, p. 17 (testimony and ruling on motion to suppress).

[84] *State v. Hunter*, 2014-0221 (La.App. 1 Cir. 9/19/14) 2014 WL 4667598, at * 4, *writ denied*, 2014-2203 (La. 9/25/15), 178 So. 3d 157.

[85] *Peters v. Whitley*, 942 F.2d 937, 939 (5th Cir. 1991), citing *Lavernia v. Lynaugh*, 845 F.2d 493, 500 (5th Cir. 1988); *see also Jordan v. Epps*, No. 09-544, 2012 WL 5997024, at *4 (S.D. Miss. Nov. 30, 2012).

[86] *Peters*, 942 F.2d at 939, citing *Lavernia*, 845 F.2d at 500.

unconstitutionally suggestive, and 2) whether there was a substantial likelihood of misidentification.[87] If the first question is answered in the negative, the inquiry ends.[88]

Hunter has failed to allege any facts to establish that the photographic lineup was impermissibly suggestive,[89] and there is nothing in the record to support her argument.  For example, there is no evidence that Baker was only given one photograph or persuaded by any officer to select a particular photograph.[90]  Further, Hunter has not established that the lineup was created maliciously to be suggestive; to the contrary, Detective Overton testified that the photographic lineup of Hunter was computer generated and aimed at creating a lineup of similar looking individuals.[91]  Review of the photographic lineup confirms that Baker was shown a photo spread that included black females who appear to be of similar age and who have a similar hairstyle to Hunter.[92]  Thus, nothing about the lineup itself was suggestive.[93]  Hunter argues that the fact Baker's statements contradicted her identification renders the identification unconstitutional and appears to take issue with the fact that Baker was shown photographs of females at all.[94]  However, showing a photographic lineup to a victim that consists of photographs that do not match the

---

[87] *Id.*

[88] *Id.*

[89] The factors stated in *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) do not apply in this case as urged by Hunter. Because the procedures used were not impermissibly suggestive, the prong regarding likelihood of misidentification, which the *Manson* factors are aimed at addressing, is not reached.  R. Doc. 1-1, p. 18.  *See Patterson v. Cain*, No. 10-4587, 2012 WL 1933748, at *5-6 (E.D. La. May 29, 2012) (noting that because the procedures were not impermissibly suggestive the *Manson* factors were not applicable).

[90] *See, e.g.*, *Manson*, 432 U.S. at 103-109.

[91] R. Doc. 10-1, p. 155.

[92] R. Doc. 10-8, p. 71 (the photographic lineup is clearer in the paper record than in the electronic record).

[93] *See Lewis v. Vannoy*, No. 16-1384, 2017 WL 6627412, at *10 (W.D. La. May 5, 2017) (finding that a computer-generated lineup consisting of men of similar height, weight, and age who have similar facial hair and facial features was not unduly suggestive despite fact that the defendant's photograph was taken from a further distance, and he was wearing a white shirt).

[94] R. Doc. 1-1, pp. 18-19.  As to Hunter's argument that "The fact that [Baker] described the petitioner the perfect way she look [sic] in the photograph is also very revealing in that the only time she had seen the petitioner was, in fact, in the actual photo" (R. Doc. 1-1, p. 19) is an inaccurate statement.  In the photographic lineup, the person identified by Baker (Hunter) has her hair down.  Testimony at trial revealed that the reason Baker originally identified Hunter as a man is because the perpetrator had her hair slicked back at the time of the robbery. R. Doc. 10-13, p. 180 and R. Doc. 10-14, p. 161-162.

victim's initial description of the assailant does not automatically render the identification procedure impermissibly suggestive.[95]  Further, the record does not contains any evidence that the procedures employed were suggestive.

Detective Overton testified that before he shows a lineup to a witness, he explains that he does not want them to make any guesses and advises them that "the person that did this crime may or may not be in this photographic lineup."[96]  When Detective Overton showed Baker the lineup including Hunter, Baker quickly identified Hunter as the perpetrator, stating "that's him. That's him."  Detective Overton informed Baker that Hunter was a female, to which Baker responded, "well, I don't care. I'm telling you that's him. I must have mistook him."[97]  Baker's signed statement that accompanies the lineup also states "this lady which I thought was a man with pulled back hair was the driver of the getaway car."[98]  Based on the evidence presented, Baker has not shown that either the line-up or the identification procedure was impermissibly suggestive, and therefore, this assignment of error is without merit.

### 5.  Claim 4: *Batson*[99]

Finally, Hunter contends her constitutional rights were violated because only three minority jurors were available for jury duty at her trial, and all were excused by the State such that she was tried by an all-white jury.  Hunter challenged the exclusion of one Asian American woman, Jennifer Huong, and two African American jurors, Susan Fabre and Donald Scott, during her PCR

---

[95] *See Ward v. Wilson*, 214 Fed.Appx. 409, 410-411 (5th Cir. 2007) (In the context of an ineffective assistance of counsel claim, a victim described her assailant as very shaved, bald, and chubby, but was shown photographs including the petitioner with a goatee and hair on his head. The victim identified the petitioner as her assailant, and the Fifth Circuit found that the procedure was not so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification).

[96] R. Doc. 10-1, pp. 182, 184.

[97] R. Doc. 10-1, p. 183.

[98] R. Doc 10-8, p. 72.

[99] *Batson v. Kentucky*, 476 U.S. 79 (1986).  R. Doc. 1-1, p. 19.

proceedings.[100] After argument, the trial court denied the claim without explanation.[101] The standard enunciated in *Batson* controls.[102] *Batson* held that a defendant must first make a prima facie showing that the prosecutor exercised peremptory strikes based on the prospective juror's race.[103] "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a race-neutral explanation for challenging [minority] jurors."[104] To establish a prima facie case of purposeful discrimination in jury selection, the defendant must demonstrate the following: (1) members of a cognizable racial group have been excluded from the jury; (2) the challenge was peremptory; and (3) the defendant must show circumstances sufficient to raise an inference that the prosecutor struck the prospective juror on account of race.[105] If the State advances putatively neutral reasons, the defendant bears the ultimate burden of proving that those reasons are pretextual.[106]

Hunter is an African American female and the prosecution used peremptory challenges to exclude two African Americans from the jury, as well as an Asian-American woman. "No formula exists for determining whether the defense has established a prima facie case of purposeful racial discrimination."[107] However, relevant factors may include whether a pattern of striking individuals of a certain race raise emerged during voir dire and/or whether questions and statements made

---

[100] R. Doc. 10-17, pp. 191-93.

[101] R. Doc. 10-20, pp. 187-89.  Though the claim was denied without reason, AEDPA deference still applies.  *See Harrington v. Richter*, 562 U.S. 86, 100 (2011).

[102] *Batson*, 476 U.S. at 96-97.  Though Huong is of a different race than Hunter, the analysis under *Batson* still applies, despite the right arising under the Fourteenth Amendment instead of the Sixth.  *See Moody v. Quarterman*, 476 F.3d 260, 267 (5th Cir. 2007) (citing *Powers v. Ohio*, 499 U.S. 400, 415 (1991) (the Supreme Court has held that defendants have standing to raise a prospective juror's equal protection claim by way of a *Batson* challenge, even if the prospective juror is of a different race.").

[103] *Batson*, 476 U.S. at 96-97.

[104] *Id.* at 97.

[105] *Brown*, 2021 WL 6495508, at *10.

[106] *Batson*, 476 U.S. at 94, n. 18.

[107] *Brown*, 2021 WL 6495508, at *10.

during voir dire differed between various racial groups so as to be "loaded" against members of a particular cognizable racial group.[108]   These examples are illustrative.[109]

Based upon the record before this Court, Hunter has failed to establish a prima facie case for a *Batson* violation.[110]   She has offered only a conclusory statement that these jurors were excused because of race. Nothing in the State's questions or statements during voir dire creates any inference of discrimination to support a prima facie showing under *Batson.*   Throughout voir dire, the court asked prospective jurors basic questions.[111]   With each batch of prospective jurors, the venire was questioned as a whole regarding whether any of them knew any witnesses, whether they had friends or relatives employed by the district attorney's office, the state police, the sheriff's office, or any other law enforcement agency.[112]   The prosecution then asked the same basic questions to each of the individual potential jurors.[113]   There is no indication in the record that the prosecution intended to load questions or statements against any particular racial group.[114]

Further, the state did not use peremptory strikes against only minority jurors; rather, it used its peremptory strikes against potential jurors who appear, based on the record, to be non-minorities.[115]   Overall, the prosecution used all twelve of the peremptory strikes available for it to

---

[108] *See Batson*, 476 U.S. at 97.

[109] *Id.*

[110] It is unclear whether the trial court found a prima facie case was made, though the ultimate conclusion was that no violation occurred.

[111] *See generally* R. Docs 10-11 & 10-12.

[112] *See, e.g.*, R. Doc. 10-12, p. 16.

[113] *See, e.g.*, R. Doc. 10-11, pp. 20-22; 24-30.

[114] The trial court concluded that the State's reason for excusing Fabre because her ex-husband was an assistant district attorney was gender and race neutral (R. Doc. 10-12, pp. 17-33 (voir dire) & 91), but every potential juror was questioned regarding relation to persons involved in law enforcement.  *See, e.g.*, R. Doc. 10-11, pp. 8-9 (questioning an individual whose live-in boyfriend was a sheriff's officer in East Baton Rouge), R. Doc. 10-11, pp. 9-10 (questioning individual whose brother-in-law was a Denham Springs police officer).  Similarly, all jurors were questioned regarding distinguishing between description and identification, which was the stated basis for the State's strike of Scott.  R. Doc. 10-12, p. 92; *see, e.g.*, R. Doc. 10-11, pp. 26-29.

[115] Though the record does not explicitly state the race of individual jurors, based upon Hunter's argument that the only minority jurors present were those who were struck, this Report assumes the other jurors stricken by the state were non-minorities.  *See* R. Doc. 10-11, pp. 86-87, 162, 238-239, 242 (the State used peremptory strikes against presumably white, non-minority individuals).

use, seven of which were used before striking any of the minority individuals, and two which were used after the minority individuals were stricken. Based upon the record as a whole, there was no basis to shift the burden to the State to present race neutral reasons for the use of the peremptory challenges because Hunter did not carry her burden in establishing a prima facie case.

Even assuming Hunter made the required prima facie showing for the first step, a review of the voir dire transcript demonstrates that the State offered race neutral explanations for excusing the above jurors that were accepted by the trial court, and with respect to Fabre and Scott, Hunter's counsel agreed these jurors should be stricken.[116] The prosecutor must only present a comprehensible race neutral reason for excusing the juror, "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it suffices.[117] The State provided non-discriminatory reasons for excusing each of the above jurors.

The State's reasons for excluding Fabre included that she indicated a higher standard would apply for conviction if the tate did not produce a gun and concerns regarding her ex-husband being an assistant district attorney and the fact that she sometimes "disagreed and knocked heads" with her ex-husband regarding cases.[118] Hunter's counsel accepted the State's reasons as being race-neutral, "given the fact that [Fabre] said that she wouldn't convict if he couldn't present any evidence."[119] The trial court noted that it had concerns regarding Fabre's relationship with her ex-husband and found the State's reasons gender and race neutral, overruling the challenge.[120]

---

[116] R. Doc. 10-12, pp. 88-93.
[117] *Purkett v. Elem,* 514 U.S. 765, 767-768, (1995) (per curiam).
[118] R. Doc. 10-12, p. 89.
[119] R. Doc. 10-12, p. 89.
[120] R. Doc. 10-12, p. 91.

The State argued it excused Scott because he indicated he did not distinguish between recognition and description, which was a vital part of the case because the defense was going to argue that victims did not describe the assailants.[121]  Hunter's counsel stated, "that discharge is perfectly acceptable to me." Hunter's counsel expressed concerns about Scott's answers regarding his ability to be definite in identifying an assailant.[122]  The trial court agreed, even noting that Scott's response regarding the identification gave the court pause, and allowed Scott to be excused.[123]

The State said it struck Huong because she was pulled in for jury duty while she was at the courthouse to pay a traffic ticket and because the State "didn't think she understood the criminal process, at all."[124] The trial court overruled the *Batson* challenge finding that the State had a valid, race-neutral reason to dismiss Huong.[125]

In each of the above instances, the state trial court assessed the circumstances and determined that the State had not used its peremptory challenges improperly.  With respect to the only two African American jurors excluded, Hunter's counsel agreed, and the Court also noted it had concerns regarding these jurors. In analyzing a *Batson* challenge, a trial court's decision on the ultimately question of discriminatory intent is a finding of act that is accorded great deference.[126]  This is because such a finding largely turns on the state court's "evaluation of credibility."[127]  We presume the state court's "factual findings to be sound unless [the petitioner] rebuts the presumption of correctness by clear and convincing evidence."[128]  The state court's

---

[121] R. Doc. 10-12, p. 92.
[122] R. Doc. 10-12, pp. 92-93.
[123] R. Doc. 10-12, p. 93.
[124] R. Doc. 10-12, p. 77.  While questioning Huong, the prosecution noted its concern that she appeared to be confused as to the concept of principals to a crime.  R. Doc. 10-11, pp. 199-200.
[125] R. Doc. 10-12, p. 78.
[126] *Hernandez v. New York,* 500 U.S. 352, 364 (1991).
[127] *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003).
[128] *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

finding of a lack of discriminatory intent has not been rebutted at all. Hunter has not offered any evidence, much less clear and convincing evidence, to establish that the findings by the state trial court as to the State's request to excuse the jurors at issue were unreasonable, or were not supported by the record, so as overcome the presumption of correctness under AEDPA.[129]  The state court's denial of relief on this claim was not contrary to or an unreasonable application of *Batson*, and the claim is without merit.[130]

### C.  A Certificate of Appealability Should be Denied

Should Hunter pursue an appeal, a certificate of appealability should be denied. An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."[131] Although Hunter has not yet filed a Notice of Appeal, the Court may address whether she would be entitled to a certificate of appealability.[132]  A certificate of appealability may issue only if a habeas petitioner has made a substantial showing of the denial of a constitutional right.[133]

In cases where the Court has rejected a petitioner's constitutional claims on substantive grounds, a petitioner must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."[134]  Reasonable jurists would not debate the denial of Hunter's Petition or the correctness of the substantive rulings. Accordingly, it is

---

[129] *Miller-El,* 537 U.S. at 240, 251-52.
[130] *See Williams v. Davis*, 192 F.Supp.3d 732, 759 (S.D. Tex. June 28, 2016) (no entitlement to federal habeas relief on *Batson* grounds where capital defendant was tried by all-white jury after the State dismissed all the potential black jurors).
[131] 28 U.S.C. § 2253(c)(1)(A).
[132] *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).
[133] 28 U.S.C. § 2253(c)(2).
[134] *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005), (quoting *Miller-El*, 537 U.S. at 327).

appropriate that, if Hunter seeks to pursue an appeal in this case, a certificate of appealability should be denied.

## **RECOMMENDATION**

**IT IS RECOMMENDED** that the Petition Under 28 U.S.C. §2254 for Writ of Habeas Corpus by a Person in State Custody,[135] filed by Petitioner Tara Hunter, be **DENIED** and **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER RECOMMENDED** that a certificate of appealability be **DENIED** if Petitioner seeks to pursue an appeal.

Signed in Baton Rouge, Louisiana, on August 29, 2022.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

---

[135] R. Doc. 1.